**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK**
----------------------------------------X

UNITED STATES OF AMERICA,

                Plaintiff,

    -against-

IMC EASTERN CORP. AND ISLAND
TRANSPORTATION CORP.,

                Defendants.
----------------------------------------X

**MEMORANDUM OF DECISION & ORDER**

18-CV-3818(GRB)(ARL)

**FILED
CLERK**

12:49 pm, Sep 12, 2022

**U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE**

**GARY R. BROWN, United States District Judge**:

Appearances:

Michael S. Blume
U.S. Attorney's Office, E.D.N.Y.
*Attorneys for Plaintiff*
271 Cadman Plaza East
Brooklyn, NY 11201

Robert R. Lucic
Sheehan Phinney Bass & Green Professional Assoc.
*Attorneys for Defendant IMC Eastern Corp.*
1000 Elm Street
Po Box 3701
Manchester, NH 03105

Sheila Ann Woolson
Epstein Becker & Green P.C.
*Attorneys for Defendant Island Transportation Corp.*
One Gateway Center
12th Floor
Newark, NJ 07102-5003

Michael Walter Peters
Stockli Slevin & Peters LLP
*Attorneys for Third-Party Defendants Frost Street Parties*90 State Street
Suite 1011
Albany, NY 12207
John McGahren

1

Morgan, Lewis & Bockius LLP
*Attorneys for Third-Party Defendants GTE Operations Support Incorporated, GTE Sylvania Inc. n/k/a Osram Sylvania, Inc. and Sylvania Electric Products n/k/a Osram Sylvania, Inc.*
502 Carnegie Center
Princeton, NJ 08540

John G. Martin
Garfunkel Wild P.C.
*Attorneys for Third-Party Defendant Arkwin Industries, Inc.*
111 Great Neck Road
Suite 503
Great Neck, NY 11021

Phillip C. Landrigan
Cohen LaBarbera & Landrigan, LLP
*Attorneys for Third-Party Defendant Grand Machinery, C&O Realty, William Gross, and Tishcon Corporation*
99 Brookside Avenue
Chester, NY 10918

Todd M. Hooker
Askin & Hooker, LLC
*Attorneys for Third-Party Defendant and Fourth-Party Plaintiff Vishay GSI, Inc.*
200 Woodport Road Suite A
Sparta, NJ 07871

Before the Court are two motions to enter Consent Judgments between the United States and two potentially responsible parties ("PRPs"), Island Transportation Corp. ("ITC") and IMC Eastern Corp. ("IMC"), and objections thereto by other PRPs.[1] For the reasons set forth below, both motions are GRANTED.

BACKGROUND

*Factual Background*

---

[1] "Objecting Defendants" refers to three groups of objecting PRPs: (1) Third-Party Defendants 101 Frost Street Associates, L.P. and Next Millennium Realty, LLC, and Fourth-Party Defendants Bancroft Construction Corp., Edgecombe Construction Corp., Jerry Spiegel Associates, and Jerry Spiegel (by and through Pamela Spiegel Sanders, as executor of the last wills and testaments and duly authorized administrators of the estates of Emily Spiegel and Jerry Spiegel, and Lise Spiegel Wilks, as executor of the last wills and testaments and duly authorized administrator of the estates of Emily Spiegel and Jerry Spiegel) (collectively "Frost Street Defendants"); (2) Third-Party Defendants GTE Sylvania Inc., Sylvania Electric Products, GTE Operations Support Incorporated, and Vishay GSI, Inc. (collectively "GTE Defendants"); and (3) Third-Party Defendants Grand Machinery, C&O Realty, William Gross, Tishcon Corporation, and Arkwin Industries, Inc. (collectively "Other Third-Party Defendants").

The New Castle Industrial Area ("NCIA") is a 170-acre industrial and commercial area located in Nassau County, New York. Compl, DE 1 at ¶ 19. The Site is located adjacent to and downgradient of the New Cassel Industrial Area. *Id.* at ¶ 3. IMC operated at 570 Main Street, within the western portion of the NCIA, from 1953 to 1992. *Id.* at ¶ 20; Medine Decl., DE 94-2 at 4. During its operations IMC utilized tetrachloroethylene ("PCE"), trichloroethylene ("TCE"), and 1, 1, 1-trichloroethane ("1, 1, 1-TCA"). Compl., DE 1 at ¶¶ 21-22. ITC operated at 299 Main Street in the western portion of the NCIA from 1971 to 1981, north of the western portion of OU-1. *Id.* at ¶ 25; Medine Decl., DE 94-2 at ¶ 7. ITC utilized TCE during its operations. Compl., DE 1 at ¶¶ 26, 27.

Following investigations and sampling conducted by the New York State Department of Environmental Conservation ("NYSDEC") from 1986-2010, the state requested that the Site be included on the National Priorities List and the Site was added in September of 2011. *Id.* at ¶¶ 35-36. After conducting their own investigation, the EPA issued a Supplemental Remediation Investigation Technical Memorandum ("SRI") in July of 2013 and designated three groundwater plumes in OU-1. *Id.* at ¶ 37. Collectively, the Western, Central, and Eastern plumes within OU-1 were found to contain TCE, PCE, and 1, 1, 1-TCA. *Id.* The Western Plume is predominantly TCE, the Eastern Plume is primarily PCE, and the Central Plume is identified by the presence of 1,1,1-TCA. GTE Defendants Opp., DE 110-17 at 3. The EPA contended that releases from the 570 Main Street and 299 Main Street properties contributed to the Western Plume. Compl., DE 1 at ¶ 40. While OU-1 is directly south of the NCIA, OU-2 is east of OU-1 and OU-3 is south of OU-1. Medine Decl., DE 94-2 at 2.

In September of 2013, the EPA released a Record of Decision ("ROD") for OU-1 providing for an interim remedy that was jointly objected to by IMC, ITC, Arkwin Industries, Inc., 101 Frost

Street, Next Millennium, C&O Realty, Grand Machinery, William Gross, and Tischcon Corporation. *See* ITC Reply, DE 110-34 at 3. IMC & ITC have steadfastly maintained these objections, particularly in response to the 2018 Unilateral Administrative Order ("UAO") issued by the EPA. *See* April 25, 2018 IMC & ITC UAO Comment, DE 110-36 at Ex. 2. In their objections, the parties relied on reports prepared by environmental consultant Gradient and specifically noted: (1) their likely *de minimis* contribution to the Western Plume, (2) data gaps in the EPA's sampling measures, (3) the EPA's failure to consider sources of contamination from upgradient properties that contributed to OU-1 based on the established south-southwest flow of groundwater in the aquifer, and (4) the EPA's failure to account for the migration of the Eastern Plume into OU-3. *See* September 23, 2013 Comment, DE 110-36 Ex. 1 at § I.A; April 25, 2018 IMC & ITC UAO Comment, DE 110-36 Ex. 2 at 1.

In their May 24, 2018 Letter of Intent to the EPA regarding the UAO, ITC set out its Sufficient Cause Defenses, among them was the assertion that contamination levels were higher entering the 299 Main Street property than leaving it, indicative of upgradient contamination given the well-documented south-southwest flow of groundwater in the area. *See* May 24, 2018 Letter of Intent, DE 110-36 Ex. 3 at 3-4. ITC also argued that sampling data indicated that it was not contributing to contamination at the western edge of OU-1 as the EPA contended. *Id*.

The EPA estimated the costs of potential remedies ranging from zero to $24,200,000, but the option ultimately selected was estimated to cost $22,900,000, with more than half of that figure attributable to the clean of the Western Plume of OU-1. 101 Frost Street Opp., DE 110-1 at 6; Sobieraj Decl., DE 110-20 at ¶ 18. The ROD goes on to state that "[t]his interim action remedy selected for OU1 is an initial action intended to minimize further migration of contaminants while

4

an RI of the far-field area can be conducted. The selected remedy does not constitute the final remedy for the Site." ROD, DE 110-4 at 36.

Prior to reaching these agreements, the United States and IMC & ITC participated in a mediation spanning several months and including presentations by expert witnesses from both sides. USA Br., DE 110 at 13. Following the mediation, the parties continued to negotiate for over a year before reaching a settlement. *Id*. Under the agreements, IMC and ITC covenant not to sue the United States or any other potentially responsible parties ("PRPs") for response costs relating to the Site. IMC Consent Judgment, DE 92-1 at ¶¶ 17-20; ITC Consent Judgment, DE 92-2 at ¶¶ 16-19. The United States covenants not to sue IMC or ITC regarding the Site. IMC Consent Judgment, DE 92-1 at ¶¶ 14-16; ITC Consent Judgment, DE 92-2 at ¶¶ 14-15. Additionally, the Consent Judgments dismiss all third- and fourth-party claims asserted by or against IMC and ITC with prejudice and "all other claims and causes of action filed by any person in this action are dismissed without prejudice." IMC Consent Judgment, DE 92-1 at ¶ 24; ITC Consent Judgment, DE 92-2 at ¶ 23. Pursuant to the Consent Judgments, IMC and ITC will receive protection from contribution actions as contemplated by CERCLA. IMC Consent Judgment, DE 92-1 at ¶ 22; ITC Consent Judgment, DE 92-2 at ¶ 21.

The Objecting Defendants contend that, notwithstanding years of investigation and litigation and the vast resources poured into these matters, the settlement is premature and based on an incomplete record.

*Procedural Background*

The United States filed its complaint against IMC and ITC on July 2, 2018, seeking to recover response costs incurred by the EPA at the Site. DE 1. On April 1, 2020, ITC filed a Third-

5

Party Complaint against nineteen third-party defendants, including the GTE Defendants.[2] *See* ITC Amended Answer, DE 24 at ¶¶ 5-43.  The Consent Judgments were lodged before the Court on April 9, 2021.  DE 92-1, DE 92-2.  Under the agreements, IMC will pay $1,000,000 and ITC will pay $687,500 in exchange for covenants not to sue for specified matters and contribution protection.  IMC Consent Judgment, DE 92-1 at ¶¶ 5, 14, 17-20; ITC Consent Judgment, DE 92-2 at ¶¶ 5, 14, 16-19.

On April 14, 2021, the United States published notice of the proposed Consent Judgments to allow 30 days for public comment.  86 Fed. Reg. 19642 (Apr. 14, 2021).  The GTE Defendants filed the only public comment during the 30-day period, contending that the settlements were premature.  USA Br., at 1-2.  On March 16, 2022, the fully briefed motions in support of and against the Consent Judgments were filed.  DE 110.  On April 11, 2022, Third Party Defendant Arkwin Corporation filed a motion seeking leave to file a sur-reply memorandum of law.  DE 111.

## DISCUSSION

### *Standard of Review*

CERCLA provides that "[w]henever practicable and in the public interest, as determined by the President, the President shall act to facilitate agreements under this section that are in the public interest and consistent with the National Contingency Plan in order to expedite effective remedial actions and minimize litigation."  42 U.S.C.A. § 9622.

"A district court reviewing CERCLA is required to rule on the fairness of any proposed settlement."  *In re Cuyahoga Equip. Corp.*, 980 F.2d 110, 118 (2d Cir. 1992) (internal citation omitted).  While the Court may not simply rubber stamp these agreements, the Court is neither

---

[2] Judge Lindsay's July 2, 2020 Order deemed "all cross claims and counterclaims for CERCLA contribution and declaratory judgment asserted by the answering third-party defendants and denied by the respective parties." DE 68. The Order "only relates to the answering third-party defendants' cross claims and counterclaims for contribution and declaratory judgment" but "would not affect the underlying complaint filed by the United States nor would it affect any fourth party complaint or other pleading." *Id*.

required nor encouraged to conduct a trial on the merits. *See Seggos v. Datre*, 2019 WL 13180721, at *2 (E.D.N.Y. Sept. 30, 2019) ("When reviewing a proposed consent decree in the CERCLA context, a trial court's [ ] function is circumscribed: it must ponder the proposal only to the extent needed to satisfy itself that the settlement is [1] reasonable, [2] fair, and [3] consistent with the purposes that CERCLA is intended to serve.") (alterations in original) (citation omitted). The Court must also remain cognizant of the overarching public policy in favor of settlements. *See United States v. Hooker Chem. & Plastics Corp.*, 776 F.2d 410, 411 (2d Cir. 1985); *State of New York v. Air-Flo Mfg. Co.*, No. 02-CV-762S, 2004 WL 1563081, at *1 (W.D.N.Y. June 3, 2004) ("[T]he usual federal policy favoring settlements is even stronger in the CERCLA context.").

With this deferential standard firmly in mind, the Court turns to the motions at bar.

## ANALYSIS

"In reviewing a proposed consent decree, a district court must determine if it 'is fair, reasonable, and faithful to the objectives of CERCLA.'" *United States v. Gen. Elec. Co.*, 460 F. Supp. 2d 395, 401 (N.D.N.Y. 2006), *aff'd sub nom. Town of Ft. Edward v. United States*, 2008 WL 45416 (2d Cir. 2008) (quoting *United States v. Cannons Eng'g Corp.*, 899 F.2d 79, 84 (1st Cir. 1990)). The fairness inquiry encompasses an examination of both procedural and substantive fairness. *New York v. Next Millennium Realty, LLC*, 2016 WL 11189177, at *3 (E.D.N.Y. 2016).

### *ITC Consent Judgment*

The settling parties seek approval of a Consent Judgment that would require ITC to pay $687,500 towards the costs of cleanup at the NCIA. ITC Consent Judgment, DE 92-2 at ¶ 5. Since the estimated cost of the government's cleanup is $75,000,000, USA Br., DE 110 at 13-14, and ITC contributed an estimated 0.45% towards the contamination at the Site, *see* Medine Decl., DE 94-2 at ¶ 13, the $687,500 figure corresponds to more than double ITC's share of the contamination

at the Site: $75,000,000*0.45% = $337,500. *See* Medine Decl., DE 94-2 at ¶ 13. This figure was reached by the United States' expert, Dr. Medine, based on his review of previous studies at the site and an analysis of the characteristics of both the plumes and the hydrogeologic conditions at the site. *Id*. at ¶ 8. It is uncontroverted that the groundwater in this area flows in a south-southwest direction. *Id*. ¶ 10.

*Procedural Fairness*

When assessing the procedural fairness of an agreement the Court will consider "whether negotiation was adversarial and conducted at arm's length; whether the counsel was skilled; whether extensive formal discovery or other information-sharing procedures provided the parties with adequate information." *55 Motor Ave. Co. v. Liberty Indus. Finishing Corp.*, 332 F. Supp. 2d 525, 530 (E.D.N.Y. 2004). There are no indications here of anything less than a fair bargaining process. The parties conducted a mediation session that included the presentation of expert testimony from both sides and negotiations continued for over a year following the mediation. This agreement is neither a sweetheart deal nor a shot in the dark.

That Objecting Defendants were not included in these settlement discussions does not impact their fairness. *See Next Millennium Realty, LLC*, 2016 WL 11189177, at *4 ("In evaluating a proposed consent decree, the court must not overemphasize[ ] the importance of its potential effect on the non-settlors…as to do so would frustrate those objectives.") (internal quotation marks and citations omitted); *City of New York v. Exxon Corp.*, 697 F. Supp. 677, 690 (S.D.N.Y. 1988) (noting instances where settlements were approved over the objection of defendants not included in negotiations). To require otherwise would frustrate the purpose of CERCLA in situations such as these where there are potentially dozens of PRPs. One recalcitrant hold-out could

8

singlehandedly stymie the efficiency gains CERCLA is meant to facilitate through early settlement and minimization of litigation.

The objecting defendants were put on notice that settlement negotiations were occurring via the letter filed by the settling parties. *See* 10/30/19 Letter*,* DE 17.  Objecting defendants remained free to engage in their own settlement discussions with the government during that period and were on notice that other parties were doing so.

The requirements of procedural fairness are, therefore, satisfied.

*Substantive Fairness*

"Substantive fairness deals with corrective justice and accountability; a party should bear the cost of the harm for which it is legally responsible." *Gen. Elec. Co.*, 460 F. Supp. 2d at 401 (internal quotation marks and citations omitted).  "The terms of a consent decree are substantively fair if they are based on the comparative fault and if liability is apportioned in relation to rational estimates of the harm each party has caused." *Air-Flo Mfg. Co.*, 2004 WL 1563081, at *2 (citation omitted).

Objecting defendants seek to impose a requirement of mathematical precision on the United States, but that standard is, however, contrary to the legislative directive the court is operating under.  Practical considerations prevent the type of precision sought by Objecting Defendants as such a high burden would frustrate the statute's goal of facilitating early settlement and minimizing litigation. *Next Millennium Realty, LLC*, 2016 WL 11189972, at *4 ("Although accountability is of paramount importance, practical considerations prevent liability from being apportioned with absolute certainty or exacting precision.") (citation omitted).  Further, "[w]here, as here, sophisticated actors know how to protect their own interest, and they are well equipped to

9

evaluate risks and rewards, the court has little need…to police the substantive fairness of a settlement as among settling parties." *55 Motor Ave. Co.*, 332 F. Supp. 2d at 531 (citation omitted).

This is not a case where the record is so bereft of information that any consideration of the relationship between total cost and individual liability would be rendered arbitrary or capricious. Numerous studies and samplings on the site have been conducted stretching back decades and the United States' expert, Dr. Medine, relied on this information when preparing his report.[3] The geographic location of ITC within the NCIA and the observable south-southwest flow of the ground water comport with the settling parties' contention that ITC's contribution to both OU-1 and OU-3 is *de minimis*.[4] As Dr. Medine states, "since OU-3 is downgradient of OU-1 and ITC's potential contribution is moving to the south-southwest, there would only be a minor impact on OU-3 because of the generally decreasing concentrations with increasing distance from OU-1." Medine Decl., DE 94-2 at ¶ 12. That the figures are not mathematically precise should not be used to hinder the entry of the settlement, as the government has articulated a rational basis for calculating both total costs and the relative share attributable to ITC. *See Next Millennium Realty,*

---

[3] That the Objecting Defendants retained experts of their own who reached different conclusions is inapposite here. The court is not required nor encouraged to conduct a trial on the merits and a battle of experts is precisely the type of probing judicial inquiry CERCLA was designed to avoid. *United States v. E.I. du Pont de Nemours & Co.*, 341 F. Supp. 2d 215, 250 (W.D.N.Y. 2004) ("[T]he federal courts have neither the time nor the expertise to conduct a *de novo* review of the scientific evidence supporting (or opposing) the selection of a particular response action.") (internal quotations and citation omitted); *United States v. Rohm & Haas Co.*, 721 F. Supp. 666, 686 (D.N.J. 1989) ("Moreover, it is inconceivable that Congress, wishing to provide EPA with the statutory tools to make the most efficient use of its enforcement resources, would urge EPA to reach speedy settlements with *de minimis* parties but then require such settlements to be subject to *de maximis* judicial review."); *United States v. Davis*, 11 F. Supp. 2d 183, 191-92 (D.R.I. 1998), *aff'd*, 261 F.3d 1 (1st Cir. 2001) (stating "evidence need not be exhaustive or conclusive in order to determine whether a proposed settlement is substantively fair. To hold otherwise would require that a case, first, be tried in order to decide whether it can be settled. Such a requirement would be impractical and would frustrate CERCLA's objective"); *United States v. Akzo Coatings of Am., Inc.*, 949 F.2d 1409, 1424 (6th Cir. 1991) ("Ours should not be the task of engaging in a *de novo* review of the scientific evidence…The federal courts have neither the time nor the expertise to do so, and CERCLA has properly left the scientific decisions regarding toxic substance cleanup to the President's delegatee, the EPA administrator and his staff.").
[4] Levels of TCE and PCE were highest at the *southeast* corner of the 299 Property closer to 570 Main Street, lending further credence to Dr. Medine's conclusions that upgradient facilities (e.g., Barouh-Eaton, Atlas) were larger contributors than ITC given ITC's downgradient location and the general south-southwest flow of ground water. *See* Voci Decl., DE 110-35 at ¶ 10; Medine Decl. at ¶¶ 8, 13.

*LLC*, 2016 WL 11189972, at *3 ("Once the [government agency] has selected a reasonable method of weighing comparative fault, the agency need not show that it is the best, or even the fairest, of all conceivable methods.") (citation omitted) (alteration in original).

The fact that the exact bounds OU-2 & OU-3 have not yet been finalized should not be used to thwart approval of the Consent Judgment. *55 Motor Ave. Co.*, 332 F. Supp. 2d at 532 ("Although the proposed plan does not provide for the cleanup of Plume B, this court is confident that the environment will be best protected by beginning cleanup of the non-Plume B contamination immediately and proceeding with an investigation and cleanup of Plume B contamination separately."). Pietro Mannino, the Chief of the Western New York Remediation section of the EPA who has worked on the Site for over a decade, reviewed the available data for all three operable units and determined that, due to commonalities between the three operable units, it was reasonable to estimate that costs for all three operable units would be similar. *See* Mannino Decl., DE 94-3 at ¶¶ 6, 8-9. Waiting for more information to be released on those operable units would not serve the public interest since ITC's contribution to OU-3 is *de minimis* and non-existent for OU-2. USA Br, DE 110 at 17-18.

The figures proffered are supported by the record and should not be disturbed for lack of absolute mathematical precision. "A rough approximation of the responsibility borne by each party is sufficient provided that the method of allocation is rational…[T]he evidence need not be exhaustive or conclusive …because to require otherwise, would be impractical and would frustrate CERCLA's objective of encouraging early settlement." *Next Millennium Realty, LLC*, 2016 WL 11189972, at *3 (internal quotation marks and citations omitted). Based on the experts' analyses, the government estimates that total response costs would be approximately $75,000,000. *See* Mannino Decl., DE 94-3 at ¶ 8. Given Dr. Medine's calculations based on the historical

documentation and site sampling that ITC was responsible for approximately 0.45% of overall contamination, the settlement is eminently fair. ITC has agreed to pay $687,500, a premium of $350,000 on its likely liability of $337,500, i.e., 0.45% of the $75,000,000 total cleanup cost. The premium represents a compromise between the parties that allows the government to obtain response costs immediately and allows ITC to avoid future liability without additional litigation. The settlement here is substantively fair as it is based on a reasonable estimate of the total cost of remediation for the site and ITC's comparative culpability.[5]

Nor should the existence of residual or so-called "orphan" shares stymie the entry of the judgment. Pursuant to Section 113(f)(2), "[a] person who has resolved its liability to the United States or a State in an administrative or judicially approved settlement shall not be liable for claims for contribution regarding matters addressed in the settlement." 42 U.S.C. § 9613(f)(2). If "[t]he settling defendant now is protected from claims for contribution . . . any defendants found liable are responsible for their allocated proportion of the total damages . . . including the so-called 'orphan shares.'" *Niagara Mohawk Power Corp. v. Consol. Rail Corp.*, 291 F. Supp. 2d 105, 121 n. 5 (N.D.N.Y. 2003), *aff'd in part, rev'd in part on other grounds sub nom. Niagara Mohawk Power Corp. v. Chevron U.S.A., Inc.*, 596 F.3d 112 (2d Cir. 2010). Orphan shares "[are] the result of a deliberate policy choice made by Congress in order to encourage settlements…the intended effect of § 113(f)(2) is that non-settling defendants may bear disproportionate liability for their acts." *United States v. Occidental Chem. Corp.*, 200 F.3d 143, 150 n.8 (3d Cir. 1999) (citations omitted); *Exxon Corp.*, 697 F. Supp. at 694 ("To the extent that the non-settling parties are disadvantaged in any concrete way by the applicability of section 113(f)(2) to the overall

---

[5] ITC's overall contribution to OU-1 and OU-3 is plausibly established to be *de minimis* and its contribution to OU-2 is plausibly alleged to be non-existent given the established direction of underground water flow and ITC's location downgradient of OU-2. *See* Medine Decl. at ¶¶ 10-12.

settlement, their dispute is with Congress."). That the Objecting Parties may bear continued responsibility for these orphan shares is a necessary reality directly provided for in the statute.

The requirements of substantive fairness are, therefore, satisfied.

*Reasonableness*

When assessing the reasonableness of a proposed consent decree, courts consider whether the judgment: (1) effectively ameliorates environmental contamination; (2) satisfactorily compensates the public for actual and anticipated costs; and (3) effectively weighs the relative strength of the parties' litigating positions. *55 Motor Ave. Co.*, 332 F. Supp. 2d at 531–32 (citation omitted). Only the latter two factors are relevant here as the consent judgment does not require ITC to perform any remediation activities. *See* USA Br., DE 110 at 12.

Additional litigation would only serve to expend more time and public money at the expense of remediating the current contamination given ITC's minimal comparative contribution. ITC is paying more than a 100% premium on its actual liability in exchange for an early settlement and this money can immediately be put towards remediation at the Site. *See Next Millennium Realty*, 2016 WL 11189972, at *4 ("Since, under the Consent Decrees, the settling parties will be paying the majority of the response costs attributed to their conduct, the public interest is clearly met."); *Air-Flo Mfg. Co.*, 2004 WL 1563081, at *2 ("[T]he public interest is met by Defendants' paying the remediation costs attributable to their conduct."). Further, ITC's continual objection to the UAO since its issuance in 2018 demonstrates the apparent waiver of litigable issues as further consideration by ITC. *See* April 25, 2018 IMC & ITC UAO Comment, DE 110-36 at Ex. 2.

As in any settlement negotiation, each party must cede ground and factor in the strength of its position to reach a compromise. *Datre*, 2019 WL 13180721, at *5 ("Important considerations for a determination of the reasonableness of a proposed consent decree include…the relative

strength of the parties' litigating positions.") (citation omitted).  Here, the United States obtains a premium payment from ITC and ITC obtains the benefit of finality and contribution protection. That the United States did not press for penalties or treble damages for violation of the UAO falls squarely within the Executive's discretion to negotiate settlements and weigh litigation risks.  This exercise in restraint will further serve the public interest by directing funds towards response costs as opposed to future litigation costs.[6]  *Exxon Corp.*, 697 F. Supp. at 693 ("The immediate public benefit is the availability of [funds] for cleanup and remediation costs which might otherwise be drawn from public coffers. That figure does not reflect the money the City will save by not having to prosecute possibly fruitless claims against the settling companies."); *Cannons*, 899 F.2d at 90 ("The reality is that, all too often, litigation is a cost-ineffective alternative which can squander valuable resources, public as well as private."); *City & Cnty. of Denver*, 2010 WL 4318835, at *3 (D. Colo. Oct. 22, 2010) ("while [the government] could spend many more years and many more dollars in perfecting the information on which to base its claim, ... it must balance any uncertainties against its responsibility to gain compensation for the public.").

The settlement here is, therefore, reasonable as it ensures funds for response costs and avoids further litigation.

*Fidelity to the Statute*[7]

---

[6] "It is worthy of note that the proceeds derived from the settlements will be placed in a special account dedicated for use at the Site, thus the monies will in fact be spent addressing conditions at the Site." USA Br., DE 110 at 12.

[7] Objecting Defendants' argument that there is insufficient information to properly evaluate the settlement is not persuasive. "It is also clear that the settling parties had a sufficient factual record upon which to reach an informed decision about settlement terms…That record…includes…the volume and nature of the wastes disposed of at the landfills…and environmental conditions at the landfills." *Exxon Corp.*, 697 F. Supp. at 693; *United States v. Davis*, 11 F. Supp. 2d 183, 194 (D.R.I. 1998), *aff'd*, 261 F.3d 1 (1st Cir. 2001) ("CERCLA does not require an exhaustive and detailed recitation of every fact relating to the settlement. The parties need only present the terms of the agreement and facts sufficient to enable one to determine whether the proposed settlement is reasonable, fair and consistent with the purposes that CERCLA is intended to serve.").

"CERCLA must be construed liberally to effectuate its two primary goals: (1) enabling the EPA to respond efficiently and expeditiously to toxic spills, and (2) holding those parties responsible for the releases liable for the costs of the cleanup." *B.F. Goodrich v. Murtha*, 958 F.2d 1192, 1198 (2d Cir. 1992). "It is not the Court's function to determine whether this is the *best* possible settlement that could have been obtained but rather the Court's duty is to determine whether the settlement is within the reaches of the public interest." *Exxon Corp.*, 697 F. Supp. at 693 (citation omitted) (emphasis added). Further, "[i]nasmuch as the settlement agreement reduces the litigation surrounding the site cleanup and releases from liability those parties unlikely to bear responsibility for it, it further[s] CERCLA's goals." *In re Cuyahoga Equip. Corp.*, 980 F.2d at 119–20.

The agreement at issue here is faithful to the objectives of the statute. ITC is paying a premium despite being only a *de minimis* contributor and the funds collected can be put towards response activities at the Site without further litigation. The efficiency gains facilitated by this settlement will "be amplified if the present settlement encourages some or all of the remaining defendants to resolve the case through negotiation rather than expensive, risky, and protracted litigation." *Exxon Corp.*, 697 F. Supp. at 693-94.

The ITC Consent Judgment represents an informed compromise between the parties that is faithful to the objectives of CERCLA and serves the public interest.

### *IMC Consent Judgment*

Plaintiff and IMC seek approval of a Consent Judgment that would require IMC to pay $1,000,000 towards the costs of cleanup at the Site based on IMC's limited ability to pay. IMC Consent Judgment, DE 92-1 at ¶ 5; § I.F.

*Procedural Fairness*

15

For the reasons stated above, the requirements of procedural fairness are met here. Both sides were represented by competent counsel and negotiations proceeded for more than a year, including a mediation session involving conferral of experts prior to settlement.

*Substantive Fairness*

CERCLA contemplates and expressly authorizes ability to pay settlements. 42 U.S.C. § 9622(e)(3)(A) ("[G]uidelines for preparing nonbinding preliminary allocations of responsibility ... may include ... ability to pay."). "In determining whether a consent decree is reasonable, the court can consider a number of factors including…the ability of the settlers to withstand a greater judgment." *State of New York v. City of Johnstown*, 1998 WL 167311, at *5 (N.D.N.Y. 1998). Further, "under the 'ability to pay' approach, the parties need not analyze comparative fault in order for the Proposed Consent Decree to be substantively fair." *United States v. Fed. Res. Corp.*, 2013 WL 11331376, at *4 (D. Idaho 2013) (citation omitted).

Objecting defendants' contention that IMC *could* be misleading the government regarding its ability to pay is too speculative to warrant denial of the Consent Judgment.[8] *See United States v. Coeur d'Alenes Co.*, 767 F.3d 873, 878 (9th Cir. 2014) (rejecting PRP's contention that the government failed to consider an additional insurance policy as overly speculative and finding that government's retention of expert to review financial information was sufficient to warrant entry of consent decree). The United States and IMC entered this ability to pay settlement based on a review of IMC's financial, tax, and insurance records by a financial expert retained by the EPA. USA Br., DE 110 at 12; IMC Consent Judgment, DE 92-1 at § I.F. Reliance on these types of

---

[8] "FRC does not challenge CDA's ability to pay so much as it challenges the sufficiency of the government's investigation and of the district court's review of the thoroughness of that investigation. For FRC to have any success on its claim, it would have to demonstrate that the district court abused its discretion by accepting the sufficiency of an investigation conducted by the government in accordance with its own established procedures, *and it would bear an extraordinarily high burden in demonstrating such an abuse in light of the tremendous deference the district court rightfully pays to the government's determination that a consent decree is fair and proper.*" *United States v. Coeur d'Alenes Co.*, 767 F.3d 873, 879 (9th Cir. 2014) (emphasis added).

records and an expert's interpretation thereof comports with the flexibility afforded to the government in crafting settlements with PRPs that will best serve the public interest. *United States v. Fed. Res. Corp.*, 2013 WL 11331376, at *2, *4 (approving an ability to pay settlement where company proffered "financial statements, federal tax returns, and written explanations by the owner" and this information was reviewed by a financial analyst retained by the EPA).

Objecting Defendants' contentions are further undercut by the fact that the Consent Judgment and, thus, protection from contribution actions is conditioned upon the veracity of this financial information provided by IMC. Misrepresenting its financial state or withholding relevant information would not serve IMC's interests as it would place IMC back amongst the other non-settling PRPs, open to claims for contribution. IMC Consent Judgment, DE 92-1 at ¶¶ 16, 33. Nor would it serve the United States' interest as rescission would require further litigation, obviating the benefits of an early settlement.

If Objecting Defendants' fears about IMC's financial condition were to come to fruition, the government would have the right to rescind the agreement and take appropriate action against IMC. Further, other PRPs would then be able to pursue contribution actions against IMC. Additionally, the settlement is only a covenant *as to IMC*, meaning other, possibly related entities are not entitled to contribution protection. *See* IMC Consent Judgment, DE 92-1 at ¶ 14. These precautionary measures further satisfy the Court that the agreement is substantively fair.

*Reasonableness*

When assessing the reasonableness of a proposed consent decree courts consider whether the judgment: (1) effectively ameliorates environmental contamination; (2) satisfactorily compensates the public for actual and anticipated costs; and (3) effectively weighs the relative strength of the parties' litigating positions. *55 Motor Ave. Co.*, 332 F. Supp. 2d at 531–32 (citation

omitted). Only the latter two factors are relevant here as neither Consent Judgment requires cleanup work. *See* USA Br., DE 110 at 12. The IMC Consent Judgment meets both remaining factors as it provides for $1,000,000 to be used at the Site by the EPA for remediation and accounts for potential defenses from IMC's insurers and IMC's limited ability to pay. *Id*. It is emphatically not reasonable to continue litigating against a party that lacks the ability to pay as this would only serve to further deplete precious financial resources that could otherwise be put towards immediate response efforts.

*Fidelity to the Statute*

Based on the principles set forth above, the settlement is faithful to the objectives of the statute.

**CONCLUSION**

For all of the foregoing reasons:

1) The United States' motion to enter the ITC Consent Judgment is GRANTED.

2) The United States' motion to enter the IMC Consent Judgment is GRANTED.

3) Sur Reply Defendants' motion seeking leave to file a sur-reply is DENIED as moot.

4) ITC's Third-Party Complaint is DISMISSED with prejudice.

5) Third-Party Defendants' counterclaims and cross claims for contribution as to ITC and IMC are DISMISSED with prejudice.

6) All other claims are DISMISSED without prejudice.

**SO ORDERED.**

Dated: Central Islip, New York
September 12, 2022

/s/ Gary R. Brown
GARY R. BROWN
United States District Judge